UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/7/06

------------------------------------------x

POLARGRID LLC

                Plaintiff,

      - against -

VIDESH SANCHAR NIGAM LIMITED,

                Defendant.

------------------------------------------x

04 CV 9578 (TPG)

**OPINION**

Plaintiff Polargrid LLC brings this action against defendant Videsh Sanchar Nigam Limited ("VSNL"), alleging that VSNL anticipatorily breached an agreement under which it was obligated to provide Polargrid access to certain fiber optic network capacity and invest $35 million in Polargrid. Polargrid asserts claims for breach of contract or, in the alternative, promissory estoppel, and seeks an order compelling VSNL to specifically perform the contract. Alternatively, if specific performance is denied, Polargrid seeks damages. Polargrid also makes a claim for declaratory judgment and injunctive relief.

VSNL previously moved to dismiss the complaint for insufficient service of process and failure to comply with Fed. R. Civ. P. 8(a) or, in the alternative, to dismiss the promissory estoppel cause of action for failure to state a claim. In an opinion dated April 6, 2006, the court denied VSNL's motion in its entirety. See Polargrid LLC v. Videsh Sanchar

Nigam Ltd., 04-CV-9578, 2006 U.S. Dist. LEXIS 17531 (S.D.N.Y. April 6, 2006).

VSNL has now filed a supplemental motion to dismiss the complaint pursuant Rules 12(b)(7) and 19. VSNL asserts that certain entities affiliated with Polargid are necessary and indispensable parties under Rule 19, but that their joinder would destroy diversity, the only basis for the court's subject matter jurisdiction. VSNL argues that this failure to join the Polargrid affiliated entities requires dismissal of the complaint.

Polargrid opposes VSNL's motion and separately moves to amend the complaint. The proposed amended complaint contains many new factual allegations, as well as three new causes of action: fraudulent inducement, tortious interference with prospective business advantage, and violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

VSNL's motion to dismiss the complaint is denied. Polargrid's motion to file an amended complaint is granted in part and denied in part as specified herein.

BACKGROUND

Polargrid's initial complaint, filed December 6, 2004, contained the following allegations.

Polargrid and VSNL are providers of telecommunication and internet services. VSNL is based in India. As early as 2002, Polargrid began preparing to construct an international fiber optic cable system

that would traverse the Arctic Ocean and provide connectivity to Europe, Asia, and the United States. In 2003, Polargrid negotiated, but did not formally enter into an agreement with Tyco Telecommunications, Inc. ("TycoTel") under which TycoTel would plan and construct the international fiber optic cable system for approximately $800 million (the "Polarnet Contract"). The proposed arrangement with TycoTel included access for Polargrid to an existing global network of undersea and terrestrial fiber optic capacity, facilities, and usage rights, known as the Tyco Global Network ("TGN"), together with the employees, contracts, and other obligation associated therewith. TGN was owned by Tyco International, Ltd. ("Tyco"), an affiliate of TycoTel. The complaint alleges that access to TGN was crucial to Polargrid because there were no other assets available on the market that could provide the connectivity essential to Polargrid's business plan.

While these negotiations were ongoing, Tyco decided to sell TGN. In late 2003, Tyco retained Goldman Sachs & Co. to conduct an auction for the sale of TGN. The complaint alleges that Polargrid not only had the ability to win the auction, it was determined to do so, because if it were unable to access the TGN fiber optic capacity, it would need to spend over $1.5 billion more than it planned to acquire similar capacity elsewhere.

VSNL was also intensely interested in acquiring TGN. VSNL knew that Polargrid was a significant competitor in the auction for TGN. At the

suggestion of TycoTel, Polargrid representatives met with representatives from VSNL in May 2004. The two parties discussed a collaboration whereby Polargrid would abstain from the auction and support VSNL's bid to acquire TGN and, in return, VSNL would provide TGN bandwidth and financing to Polargrid. These discussions culminated in the signing of a formal Memorandum of Understanding ("MOU") executed by the parties on June 28, 2004. The MOU was signed for Polargrid by its President, James L. Hickman, and for VSNL by one of its directors.

Under the terms of the MOU, Polargrid agreed to withdraw from the bidding for TGN, to desist from any communications with Tyco or any potential bidder for TGN, and to collaborate exclusively with VSNL in its bid for TGN. In addition, in an effort to make VSNL's bid more attractive to Tyco, Polargrid agreed, and informed Tyco, that it would award the Polarnet Contract to Tyco's affiliate TycoTel only if VSNL were chosen winner of the auction. Finally, Polargrid agreed to certain restrictions on its ability to alter the terms of the proposed Polarnet Contract as it then existed.

In return, VSNL agreed to (1) invest $35 million in Polargrid by purchasing a convertible debenture as soon as it closed on the TGN acquisition; and (2) sell or lease to Polargrid at a price specified in the MOU certain agreed upon amounts of sub-sea and terrestrial fiber optic bandwidth capacity on TGN's network.

The complaint alleges that immediately after executing the MOU Polargrid fulfilled its obligations by withdrawing its previously submitted preliminary indication of interest in acquiring TGN, advising Goldman Sachs that it would not be submitting an offer for TGN, and informing TycoTel that it would enter the Polarnet Contract only if VSNL was selected as the winning bidder for TGN. Polargrid also continued to work with TycoTel to finalize the Polarnet Contract.

On November 1, 2004, VSNL and Tyco announced that VSNL had won the auction for TGN. The complaint alleges that, both immediately before and after it won the bidding for TGN, VSNL expressly repudiated its obligations under the MOU. VSNL stated that it would not provide Polargrid the promised TGN bandwidth or invest $35 million in Polargrid. Rather, VSNL took the position that it has no obligations under the MOU.

DISCUSSION

Presently before the court are VSNL's supplemental motion to dismiss for nonjoinder of necessary parties and Polargrid's motion to amend the complaint. The federal antitrust claim contained in the proposed amended complaint, if allowed, would provide an alternative basis for subject matter jurisdiction over this action, thereby mooting VSNL's motion to dismiss for failure to join indispensable but non-diverse parties. Therefore, the court will first consider Polargrid's motion

to amend the complaint before proceeding, if necessary, to VSNL's
motion to dismiss.

## Polargrid's Motion to Amend the Complaint

The proposed amended complaint contains, in addition to the
allegations of the original complaint, a host of additional factual
allegations, some of which merely expand upon the original complaint
and others that are entirely new. The proposed amended complaint also
contains three additional causes of action: fraudulent inducement,
tortious interference with prospective business advantage, and violation
of the Sherman Act § 2.

The factual allegations contained in the proposed amended
complaint may be summarized as follows. VSNL's interest in acquiring
TGN—though partly motivated by a legitimate desire to transform itself
from a provider of India-centric connectivity services to a global
provider—also had a strong anticompetitive component. VSNL allegedly
determined that, if successful in its bid to acquire TGN, the costs to a
potential competitor of duplicating the TGN network would be enormous,
and that "such a significant entry barrier would restrict new competitors
from entering the market for the next 7 years."

Indeed, VSNL's calculations were not merely theoretical. VSNL had
specific concerns regarding Reliance Infocomm, Ltd., India's largest
private telecommunications service provider and a major competitor of
VSNL. In May 2004, VSNL became aware that Reliance was also

interested in acquiring TGN. According to the proposed amended complaint, VSNL feared that, if Reliance was successful in its bid for TGN, then Reliance, and not VSNL, would dominate the global telecommunications market.

On March 17, 2004, Polargrid, VSNL, and Reliance all submitted preliminary bids to Tyco for the TGN assets. In its bid, VSNL proposed to purchase TGN for approximately $140 million in cash. Polargrid bid only $75 million but also offered to finalize its supply contract with Tyco's affiliate TycoTel, a significant carrot worth approximately $600 to $800 million to TycoTel.

Based on their preliminary bids, each of these parties was invited to continue in the bidding process. VSNL continued to be concerned about Reliance's bid because it projected that Reliance would bid over $300 million for TGN and because, in addition to this cash component of its offer, Reliance's bid also included a proposal to enter into a lucrative supply contract with Tyco. VSNL was not then in a position to enter into a supply contract with Tyco or its affiliates and feared that its bid would therefore be less attractive than that of Reliance.

VSNL, aware that Polargrid was negotiating with TycoTel to enter into the Polarnet Contract, determined that its bid would be significantly more competitive if it could leverage that supply contract in support of its bid. It therefore entered into the MOU with Polargrid, agreeing to provide Polargrid with financing and access to TGN in return for Polargid

withdrawing from the bidding process and, more importantly, informing Tyco that it would enter into the Polarnet Contract only if VSNL was selected as the winning bidder for TGN.

On June 28, 2004, VSNL submitted its bid for TGN. The bid contained a cash offer of $155 million and further specifically provided that "as part of our cash purchase price, we have arranged with Polargrid LLC and its affiliates . . . that if our bid to acquire the TGN business . . . is selected as the winning bid, Polarnet will enter into a two phase planning and construction agreement with you related to their proposed trans-Arctic sub-sea cable system . . ."

Despite these efforts, in early July, Indian media outlets reported that "Reliance leads the race for [TGN]." The proposed amended complaint asserts that these reports caused VSNL to become extremely nervous and decide to "change its strategy to beat Reliance". This change of strategy was the engagement of The Scowcroft Group, an international business advisory firm, to assist VSNL in winning the auction for TGN. According to the proposed amended complaint, the success of The Scowcroft Group in assisting VSNL to win the auction-- and the apparent failure of Polargrid's assistance--precipitated VSNL's decision to breach the MOU and sever its relationship with Polargrid.

The Scowcroft Group is headed by General Brent Scowcroft, who was National Security Advisor to President H.W. Bush and President Gerald Ford, and until recently was the Chairman of the President's

Foreign Intelligence Advisory Board. It is alleged that Scowcroft "wields considerable influence" in Washington D.C. and elsewhere. VSNL engaged the Scowcroft Group to exploit this influence in winning the bidding for TGN and obtaining certain required government approval for VSNL's purchase of this important asset.

Although VSNL first contacted The Scowcroft Group in early June 2004, the two did not reach an agreement until mid-July 2004, shortly after the Indian media reports that Reliance was poised to win the auction for TGN. Then, in a Consulting Agreement dated July 19, 2004, The Scowcroft Group and VSNL agreed that The Scowcroft Group would be paid $500,000 if VSNL was the chosen bidder and obtained the necessary government approvals to successfully close the Transaction with Tyco.

Shortly thereafter, VSNL requested that Scowcroft himself contact Edward Breem, Tyco's new Chief Executive Officer, to make a pitch for VSNL's bid. The proposed amended complaint alleges that, pursuant to VSNL's request, Scowcroft called Breem and "within days. . . VSNL became the new frontrunner in the bid to acquire TGN."

According to the proposed amended complaint, internal VSNL documents show that once it assumed the lead in the bidding for TGN— as a result of The Scowcroft Group's influence rather than the leverage provided by Polargrid's supply contract—VSNL "decided to sever its

relationship with Polargrid, but not to advise Polargrid of this fact until it actually had a deal in place to acquire the TGN assets."

By October 27, 2004, VSNL had negotiated a deal with Tyco to acquire TGN at a substantial discount. On the same day, VSNL advised Polargrid that "we are of the view that neither Polarnet nor VSNL have any further obligations under the MOU." On November 1, 2004, Tyco and VSNL formally executed an agreement for the sale of TGN and the acquisition was completed in June 2005. These factual allegations are the basis for the following causes of action asserted in the proposed amended complaint.

The proposed amended complaint contains the three causes of action contained in the original complaint, for breach of contract, declaratory judgment, and promissory estoppel, as well as three new causes of action. In the Fourth Cause of Action, for fraudulent inducement and/or fraudulent concealment, the proposed amended complaint alleges that VSNL misrepresented that it would abide by the terms of the MOU when it in fact had no intention of doing so, and that VSNL concealed its true intentions that it would not honor its obligations under the MOU.

The Fifth Cause of Action, for tortious interference with prospective business advantage, asserts that VSNL wrongfully interfered with Polargrid's existing business relationship with Tyco, which consisted of

its prospective acquisition of TGN and its ongoing negotiations with TycoTel regarding the Polarnet Contract.

The Sixth Cause of Action asserts a violation of Section 2 of the Sherman Act. In support of this claim, the proposed amended complaint alleges the following:

> 84. VSNL, through its improper acquisition of TGN, has obtained a monopoly or partial monopoly of fiber optic bandwidth and has thereby deprived Polargrid and the public of the advantages of free competition and interstate trade.
> 85. As a result of the foregoing, VSNL has the power to influence, and has improperly influenced, the price of fiber optic bandwidth causing injury to Polargrid and the public.
> 86. VSNL's anticompetitive conduct unreasonably restrains trade in the bandwidth market.

Fed. R. Civ. P. 15(a) provides that "a party may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires." While the Rule provides that leave should be freely granted, the court has the discretion to deny leave if there is a good reason for doing so, such as futility, bad faith, undue delay, or undue prejudice to the opposing party. Foman v. Davis, 371 U.S. 178, 182 (1962); State Farm Ins. Cos. v. Kop-Coat, Inc., 05-CV-1019, 2006 U.S. App. LEXIS 12977 at *3 (2d Cir. May 19, 2006).

VSNL's main argument is that the proposed amended complaint is futile. An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Rule 12(b)(6). Lucente v.

IBM, 310 F.3d 243, 258 (2d Cir. 2002); Dougherty v. North Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002). Thus, in considering whether to grant a motion to amend, the court must accept as true all of the factual allegations of the proposed amended complaint and draw all inferences in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993).

VSNL first argues that Polargrid's Sherman Act claim is futile because the proposed amended complaint does not adequately allege antitrust injury. In particular, VSNL asserts that the proposed amended complaint fails to sufficiently allege the relevant market or how VSNL's conduct injured competition in it. The court agrees.

Section Two of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. There are two elements of a Section Two claim: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); Clorox Co. v. Sterling Winthrop, Inc., 117 F.3d 50, 61 (2d Cir. 1997).

As a prerequisite to any antitrust claim, the plaintiff must allege a relevant product market which a defendant's antitrust activities are

alleged to have affected. Grinnell, 384 U.S. at 570-71; Marchon Eyewear, Inc. v. Tura LP, 98-CV-1932, 2002 U.S. Dist. LEXIS 19628 at *5 (E.D.N.Y. Sept. 30, 2002). Without a definition of the relevant product market, there is no way to measure a company's ability to act as a monopolist. United States v. Eastman Kodak Co., 63 F.3d 95, 104 (2d Cir 1995). A relevant product market includes all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand. See United States v. E.I. DuPont de Nemours & Co., 351 U.S. 377, 395 (1956). Failure to adequately plead a relevant well-defined market requires dismissal of a complaint. Queen City Pizza v. Domino's Pizza, 124 F.3d 430, 437 (3d Cir. 1997); Arnold Chevrolet LLC v. Tribune Co., 418 F. Supp. 2d 172, 186-187 (E.D.N.Y. 2006); E&G Gabriel v. Gabriel Bros., Inc., 93-CV-894, 1994 U.S. Dist. LEXIS 9455 at *10 (S.D.N.Y. July 14, 1994).

Furthermore, a private plaintiff seeking to state a claim for violation of § 2 of the Sherman Act must properly allege "antitrust injury." See Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990); G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 766 (2d Cir. 1995). The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, "that the challenged action has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." Capital Imaging v. Mohawk Valley Med. Assoc., 996 F.2d 537,

543 (2d Cir. 1993). The antitrust laws were enacted for the protection of competition, not competitors. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488 (1977). Therefore, failure to allege "how market-wide competition will be affected" by the alleged monopolistic action requires that the complaint be dismissed. Electronics Communs. Corp. v. Toshiba Am. Consumer Prods., 129 F.3d 240, 245 (2d Cir. 1997).

The proposed amended complaint fails to state a claim under Section 2 of the Sherman Act for both of the above reasons. With respect to the relevant market, the proposed amended complaint refers merely to "fiber optic bandwidth," without any explanation of what this market consists of, its geographic scope, or whether its constituent elements are interchangeable so as to qualify as a market under the antitrust laws. See E.I. DuPont, 351 U.S. at 395.

Perhaps more importantly, the proposed amended complaint does not adequately allege antitrust injury. The complaint does not contain any substantive allegations of how VSNL's conduct harmed competition in the undefined "bandwidth market." Rather, it alleges only harm to Polargrid as an individual competitor. For these reasons, the proposed amended complaint's Sherman Act claim is futile and leave to assert that claim is denied.

The court finds, however, that the other two new causes of action are not futile and should be allowed. The proposed Fourth Cause of Action alleges that, either before the signing of the MOU or immediately

thereafter, VSNL decided not to honor its obligations under that agreement, and misrepresented and concealed such designs from Polargrid. The proposed amended complaint further asserts that, after VSNL induced Polargrid to withdraw its offer for TGN and condition the Polarnet Contract upon the selection of VSNL as winning bidder, it secretly determined to sever its relationship with Polargrid. Contrary to VSNL's contention, these allegations sufficiently plead a claim of fraudulent inducement and fraudulent concealment consistent with Rule 9(b).

The proposed Fifth Cause of Action, for tortious interference with prospective business advantage, is also not futile. The parties agree that, to plead a claim for tortious interference with prospective business advantage, the complaint must allege that (1) there was a business relationship with a third party; (2) defendant knew of that relationship and intentionally interfered with it; (3) defendant either acted solely out of malice or used wrongful means; and (4) defendant's interference caused injury to the relationship with the third-party. Treppel v. Biovail Corp., 03-CV-3002, 2005 U.S. Dist. LEXIS 18511 at *13 (S.D.N.Y. August 30, 2005).

Here, the proposed amended complaint alleges that Polargrid had an ongoing business relationship with Tyco by virtue of its participation in the auction for TGN and its negotiations with Tyco's affiliate TycoTel regarding the Polarnet Contract. The proposed amended complaint

asserts that VSNL knew of this ongoing business relationship and intentionally and wrongfully interfered with it by fraudulently inducing Polargrid to withdraw its bid for TGN with a promise to provide Polargrid with TGN bandwidth once VSNL won the auction. These allegations are sufficient to state a claim for tortious interference with prospective business advantage.

VSNL argues that Polargrid's motion to amend should be denied because it would be prejudiced by the need to engage in additional discovery with respect to the new claims. This claim is unconvincing because the information upon which the proposed amended complaint is based was, until recently, in the sole possession of VSNL.

Accordingly, Polargrid's motion to amend the complaint is denied as to the proposed Sixth Cause of Action alleging a violation of Section 2 of the Sherman Act, but is granted in all other respects.

## VSNL's Supplemental Motion to Dismiss

Having denied that portion of Polargrid's motion which sought to include a federal claim in its amended complaint, the court must now turn to VSNL's supplemental motion to dismiss for failure to join certain necessary but non-diverse parties pursuant to Rule 19. Essentially, VSNL argues that certain subsidiaries and affiliates of Polargrid are necessary and indispensable plaintiffs to this action under Rule 19, but that they cannot be joined because, like VSNL, they are aliens, and "the presence of aliens on two sides of a case destroys diversity jurisdiction."

Corporacion Venezolana de Fomento v. Vintero Sales Corp., 629 F.2d 786, 790 (2d Cir. 2000). VSNL relies on the following to support its motion.

Polargrid executed the MOU "for itself and on behalf of its subsidiaries and affiliates constituting the entire family of Polarnet companies," but does not identify these other entities. The MOU was signed by Polargrid's President, James L. Hickman and a VSNL director. Hickman's deposition was taken on November 10 and 11, 2005.

At his deposition, Hickman testified that, in signing the MOU, he had the authority to--and did in fact--bind certain entities affiliated with Polargrid. These include Polarnet Project, Ltd., a U.K. company; ZAO Polarnet, a Russian company; and Polarnet Project Holdings, a Bahamian company (collectively the "Polargrid Entities"). Hickman further testified that the claims asserted by Polargrid in the complaint are brought not only for itself, but on behalf of "the group of companies, Polargrid and all of its affiliates." Hickman also testified that Polargrid was established solely to acquire TGN and that it therefore never had any capital or assets.

VSNL argues that both the MOU and Hickman's testimony show that the Polargrid Entities were parties to the MOU, and that these entities are therefore necessary and indispensable parties under Rule 19 whose nonjoinder requires dismissal of the complaint.

Rule 19 of the Federal Rules of Civil Procedure, which governs

joinder of parties, sets forth a two-step process for evaluating whether an

action should be dismissed for nonjoinder. First, under Rule 19(a), the

court must determine whether the party is necessary. A party is

necessary if:

> (1) in the person's absence complete relief
> cannot be accorded among those already parties,
> or (2) the person claims an interest relating to
> the subject of the action and is so situated that
> the disposition of the action in the person's
> absence may (i) as a practical matter impair or
> impede the person's ability to protect that
> interest or (ii) leave any of the persons already
> parties subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent
> obligations by reason of the claimed interest.

Id.

Rule 19(a) further provides that a necessary party must be joined if

doing so is feasible, -i.e., would not deprive the court of its subject matter

jurisdiction. If the party is necessary but joinder would deprive the court

of its subject matter jurisdiction, the court must then proceed under

Rule 19(b) to determine whether "in equity and good conscience the

action should proceed among the parties before it, or should be

dismissed, the absent person being thus regarded as indispensable." Id.

Rule 19(b) sets forth the following factors to guide the court's inquiry:

> first, to what extent a judgment rendered in the
> person's absence might be prejudicial to the
> person or those already parties; second, the
> extent to which, by protective provisions in the
> judgment, by the shaping of relief, or other

- 18 -

> measures, the prejudice can be lessened or
> avoided; third, whether a judgment rendered in
> the person's absence will be adequate; fourth,
> whether the plaintiff will have an adequate
> remedy if the action is dismissed for nonjoinder.

Only if the court finds that a necessary party is also indispensable,
as determined by the above factors, should the action be dismissed.

Here, the court finds that the Polargrid Entities are neither
necessary nor indispensable. VSNL argues that the Polargrid Entities are
necessary because they were, at least indirectly, parties to the MOU. It is
true that, as a general rule, parties to a contract sued upon are
necessary under Rule 19. See, e.g., Randolph Found. v. Duncan, 00-CV-
6445, 2002 U.S. Dist. LEXIS 362 at *11-12 (S.D.N.Y. January 9, 2002);
Global Discount Travel Services, LLC v. Trans World Airlines, Inc., 960 F.
Supp. 701, 707-708 (S.D.N.Y. 1997). Courts have repeatedly cautioned,
however, that the Rule 19 inquiry is a fact specific and practical one,
which "should not be based on formalistic or mechanistic grounds but
rather on pragmatic analysis of the effect of a potential party's absence."
Southeastern Sheet Metal Joint Apprenticeship Training Fund v. Barsuli,
950 F. Supp. 1406, 1414 (D. Wis. 1997); see also CFI of Wis., Inc. v.
Hartford Fire Ins. Co., 230 F.R.D. 552, 554 (D. Wis. 2005); Aetna
Casualty & Surety Co. v. Namrod Dev. Corp., 140 B.R. 56, 61 (S.D.N.Y.
1992).

In Barsuli, the plaintiffs, the National Training Fund for the Sheet
Metal and Air Conditioning Industry ("the National Fund") and the

Southeastern Sheet Metal Joint Apprenticeship Training Fund (the "Local Fund"), sought to recover from Barsuli, a recipient of scholarship funds, alleging that he had breached the terms of his Scholarship Loan Agreement ("SLA") by working for a non-union employer. The SLA named the National Fund and another entity known as the Southeastern Sheet Metal Joint Apprenticeship Training Committee ("Local Committee") as parties; the Local Fund was not referenced anywhere in the agreement. Despite being a party to the SLA sued upon, the Local Committee was not a plaintiff in the action.

Barsuli moved to dismiss for failure to join the Local Committee asserting that, as a party to the contract at issue, it was a necessary party under Rule 19. The court denied Barsuli's motion, finding that the Local Committee's interests were identical to those of the Fund, and that complete relief could be accorded among the existing parties:

> Barsuli makes no argument that complete relief cannot be granted among the existing parties. Nor would such appear to be the case. Regardless of whether the Local Committee or the Local Fund is the real co-party in interest, the National Fund is clearly a party in interest and can collect the amounts due and owing under the SLA's. Barsuli also makes no argument that, assuming the Local Committee is the true co-obligee under the SLA's, its interest as such would be impaired or impeded if the case were to proceed without it. 'Impairment may be minimized if the absent party is adequately represented in the suit,' i.e., if there is another party in the suit with virtually identical interests who would be advancing virtually the same legal and factual positions. . . . That is clearly the case here. Both the National

> Fund and the Local Fund seek to enforce the SLA's and to collect the amounts due thereunder. They both are diligently advancing the type of arguments necessary to achieve this end, and they are making strong arguments against the various defenses raised by Barsuli. Moreover, the Local Committee, which shares the same employees, office space, files and stationary as the Local Fund, is by that connection undoubtedly aware of this lawsuit. At no point has it attempted to intervene in the matter to protect any interest it may have or to show its concern that its interests are not being adequately represented.

Id. at 1414.

The same considerations apply here and compel the denial of VSNL's motion. The Polargrid Entities possess interests identical to Polargrid's, -i.e., recovery for VSNL's wrongful interference with their access to TGN and, as a consequence, the frustration of their collective plans to construct an international fiber optic cable system. Because this objective will be achieved if Polargrid is successful in this action, complete relief can be accorded among those already parties. For precisely the same reason, -i.e., the identity of interests between these parties, the Polargrid Entities' interests in this litigation will be well represented by Polargrid.

This identity of interests between Polargrid and the unnamed Polargrid Entities is clearly evidenced by the MOU itself, which Polargrid was empowered to and did in fact execute on behalf of those entities. Indeed, having accepted Polargrid as a representative to bind all the

Polargrid Entities in the MOU, VSNL cannot now be heard to contest the ability of Polargrid to adequately litigate claims arising from its alleged breach of that agreement.

Nor is VSNL at any "risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest." Rule 19(a). Under the doctrine of res judicata, the parties to an action in which a judgment on the merits has been rendered, *or their privies*, are barred from re-litigating the same cause of action in a second proceeding. Baltimore S.S. Co. v. Phillips, 274 U.S. 316, 319 (1927); Saylor v. Lindsley, 391 F.2d 965, 968 (2d Cir. 1968). Privity will be found where a party's interest in litigation is virtually identical to an interest it had in a prior litigation, where it was not actually named but can be said to have had "virtual representation." Monahan v. New York City Dep't of Corr., 214 F.3d 275, 285 (2d Cir. 2000); Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 346 (2d Cir. 1995).

Given the identity of interests between Polargrid and the Polargrid Entities, as evidenced by Polargrid's representation of those entities in the MOU, there is no doubt that any further action by the Polargrid Entities to recover on the claims asserted in this action would be barred by res judicata. See Melwani v. Jain, 02-CV-1224, 2004 U.S. Dist. LEXIS 16867 (S.D.N.Y. August 24, 2004)(finding a defendant company and its "sister company" to be in privity for res judicata purposes). The Polargrid Entities are therefore not necessary under Rule 19.

Nor are the Polargrid Entities indispensable. In fact, all four factors set forth in Rule 19(b) weigh against a finding of indispensability. As to the factors one and two, for the reasons stated above, no party will suffer prejudice as a result of the Polargrid Entities' nonjoinder. Furthermore, any judgment rendered in the absence of the Polargrid Entities will be adequate because the Polargrid Entities' rights and interests are seamlessly aligned with those of plaintiff Polargrid. Finally, the last factor,-i.e., whether the plaintiff will have an adequate remedy if the action is dismissed, weighs heavily against dismissal of this action, which has already been pending in this court for nearly two years.

## CONCLUSION

VSNL's supplemental motion to dismiss the complaint pursuant to Rules 12(b)(7) and 19 is denied. Polargrid's motion to amend the complaint is granted in part and denied in part as described above.

SO ORDERED

Dated: New York, New York
August 7, 2006

Thomas P. Griesa
U.S.D.J.